FILED BY _____ D.C.

05 JUN 13 PH 12: 38

ROBERT R. DI TROLIO
CLERK, U.S. DIST. CT.
W.D. OF TN, MEMPHIS

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
vs.                             )       No.   04-20017 DV
                                )
RANDE LAZAR, M.D., d/b/a        )
OTOLARYNGOLOGY CONSULTANTS      )
OF MEMPHIS                      )
                                )
            Defendant.          )

---

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS ALL
EVIDENCE AND TO DISMISS ALL CHARGES RESULTING FROM SEARCHES UNDER
ILLEGAL WARRANTS, DATED OCTOBER 9, 2002

---

Before the court is the August 27, 2004 motion of the
defendant, Rande Lazar, M.D., d/b/a Otolaryngology Consultants of
Memphis ("Lazar"), to suppress all evidence seized from his offices
pursuant to search warrants dated October 9, 2002, and to dismiss
all counts in the indictment resulting directly and derivatively
from the searches.   The motion was referred to the United States
Magistrate Judge for a report and recommendation.

On May 26, 2005, a hearing was held in open court before the
undersigned magistrate judge.   At the hearing, the government
called four witnesses: Mike Geasley, a criminal investigator with
DCIS for the state of Tennessee, who participated in the execution
of the search warrants; Jeffrey Knutson, also a criminal

investigator with DCIS and who also participated in the execution of the search warrants at issue; Diane Lee Lott, a former agent with the Medicaid Fraud Control Unit of the Tennessee Bureau of Investigation and a participant in the execution of the search warrants at issue, and Assistant U.S. Attorney Kevin Whitmore, who was present when the search warrants were issued. The defense called one witness, Betty Fortney, a former administrative assistant/office manager for Dr. Lazar. For the following reasons, it is recommended that the motion be granted.

<u>PROPOSED FINDINGS OF FACT</u>

Lazar was originally indicted by the grand jury on January 20, 2004. A superseding indictment was filed on November 19, 2005, charging Lazar with devising and executing a scheme to defraud and obtain money from health care benefit programs. The indictment further charges that Lazar falsified or caused to be falsified medical reports to justify billing and billed for procedures that were not performed by him, were not necessary, or were not performed at all.

The government's investigation of Lazar began in July, 2000, after Lazar's ex-office manager, Judiath Lake, filed a *qui tam* lawsuit under the Federal False Claims Act claiming that Lazar was engaged in scheme to defraud health care benefit programs. On July 29, 2001, almost a year after the *qui tam* case was filed, the

2

government executed a search of Lazar's offices.  The authority for that search was alleged to be a federal statute, 42 U.S.C. § 1320a-7, and two federal regulations, 42 C.F.R. §§ 431.107 and 1007.11. The government also served Lazar with a Department of Justice ("DOJ") subpoena which sought twelve specific categories of business records, but did not seek patient files.[1]  Over the next several months, Lazar allegedly produced over 20,000 pages of documents pursuant to the DOJ subpoenas.

In October of 2002, the lead case agent from the Tennessee Bureau of Investigation, Donald Lee, Jr., prepared applications and affidavits for search warrants on Lazar's three offices.  The search warrants for Lazar's offices located at 791 Estate Place and 777 Washington Avenue, which are at issue in this motion, were numbered 02-SW-110 and 02-SW-111 respectively.[2]  The only difference between the two search warrants were the addresses of the locations to be searched.  On October 9, 2002, after preparation of the search warrant applications, supporting affidavits, and the search warrants themselves, Agent Lee,

---

[1]  The legality of the July 29, 2001 search and the authority to use DOJ subpoenas are challenged in another suppression motion filed by Lazar on August 27, 2004.  A hearing on that motion has been set for July 21, 2005.

[2]  The search warrant for the third office is not at issue because it was never executed.

3

accompanied by AUSA Kevin Whitmore, presented the search warrant applications, supporting affidavits, and the search warrants to then Magistrate Judge J. Daniel Breen for approval and issuance of the search warrants.

The applications for issuance of the search warrants were signed by Agent Lee.  The application for the search warrant for 791 Estate Place stated as follows:

> I Donald Lee being duly sworn depose and say: I am a(n) s/A Tennessee Bureau of Investigation and have reason to believe that _ on the person of or  X on the property or premises known as (name, description and/or location) Otolaryngology Consultants of Memphis (OCM), 791 Estate Place, Memphis TN 38120 in the Western District of Tennessee there is now concealed a certain person or property, namely (describe the person or property to be seized) See Attachment A and Attachment B which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure) filing False Fictitious Claim, Mail Fraud, Wire Fraud, False Claims Relating to Health Care Matters, and Health Care Fraud concerning a violation of Title 18 United States Code, Sections(s) 287, 1341, 1343, 1035, & 1347. The facts to support a finding of Probable Cause are as follows:  See Affidavit.

Ex. 12, Application and Affidavit for Search Warrant, Case No. 02-SW-110, Western District of Tennessee.  An identical application was filed for the search of 777 Washington Ave, Memphis, TN, in Case No.  02-SW- 111, the only difference being the address of the premises.

Agent Lee supported each application with identical twelve-page affidavits setting forth his qualifications, the

4

identification of the locations to be searched, the applicable criminal statutes, the details of the investigation, a general statement regarding the items to be seized, and his belief that the locations to be searched would contain evidence, instrumentalities, and/or fruits of the crimes referenced in his affidavit.  Lee's affidavits, as did the applications, referenced an Attachment A and an Attachment B.

Attachment A to each application and affidavit, was a detailed description of the premises to be searched. Attachment B to each application and affidavit set forth eight categories of items to be seized.  These categories encompass each and every business and medical record, as well as billing information, in the offices to be searched without any limitation.  Indeed, each of the eight paragraphs in Attachment B describing the items to be seized begins with "any and all."

The first paragraph in Attachment B which deals with patient records states that items to be seized include:

> Any and all documents by whatever means stored . . .
> including but not limited to patient charts, files,
> medical records, . . . for the following patients:"

*Id.*  However, there were no patient names listed after the colon in paragraph one of Attachment B.  Nor were any patient names, chart numbers, procedures, ages of patients, insurance companies or any other identifying criteria of patients mentioned in any of the

affidavits, applications, and attachments A.    There were no
criminal statutes mentioned in Attachments A or B either.

The search warrants themselves likewise referenced Attachments
A and B.  The search warrant stated:

> Affidavit(s) having been made before me by S/A Donald Lee
> who has reason to believe that  on the person of or _X_ on
> the premises known as (name, description and/or location)
> Otolaryngology Consultants of Memphis (OCM), 791 Estate
> Place, Memphis TN 38120 there is now concealed certain
> person or property, namely (describe the person or
> property) See Attachment A and Attachment B.    I am
> satisfied that the affidavit(s) and any record testimony
> establish probable cause to believe that the person or
> property so described is now concealed on the person or
> premises above-described and establish grounds for the
> issuance of this warrant.

*Id.*   Attachments A and B to the warrant were identical to
Attachments A and B to the Applications and Affidavits.  No patient
names were listed after the colon in paragraph one of Attachment B.
Similarly, patient names, chart numbers, procedures, ages of
patients, insurance companies or any other identifying criteria of
patients were absent from the search warrants themselves, and both
attachments A and B to the search warrants.  Nor were any of the
criminal statutes mentioned in the search warrants or Attachments
A or B to the search warrants.

AUSA Whitmore testified that he was present when the
affidavits and applications, attachments A and B, and the warrants
were presented to Judge Breen.  Whitmore told the court that he

6

created a list of names of specific patients for whom records were to be seized and gave the list to Agent Lee, who in turn presented it to the magistrate judge.  Whitmore claimed that he and Judge Breen had a discussion concerning the patient list before the warrants were signed.  The substance of this conversation is unknown; however, there was some indication by Whitmore that he discussed with Judge Breen the idea of not attaching the patient list to the affidavits and applications and the warrants out of concern that the names of minor children would be made public.  In addition, Whitmore testified that at the time that Agent Lee was under oath, the patient list was a part of the search warrant package presented to the magistrate.  Judge Breen signed both warrants, and the searches were executed simultaneously at approximately 10:00 a.m. on October 10, 2002.

During the course of AUSA Whitmore's testimony, it was discovered that there were several patient lists in existence. *See* Exs. 6a, 6b, 6c, 10, and 15. None of the lists entered into evidence at the hearing were the actual list presented to the magistrate and none of them were identical.  In fact, AUSA Whitmore testified that he did not have a copy of the original patient list that was presented to the magistrate judge. Whitmore referred to the patient list attached to the government's response to the present motion as a "working copy" and stated that the attached

7

copy was not the one presented to the magistrate judge. Nor are there any patient lists in the clerk's files for 02-SW-110 or 02-SW-111.

The two locations searched were Lazar's medical offices at 777 Washington Avenue and 791 Estate Place.  Agent Mike Geasley, of DCIS, was involved in the execution of the search warrant at 777 Washington Avenue.  Geasley testified that he, along with three other agents, entered the office around 10:00 a.m. on the morning of October 10, 2002, and served the warrant upon the office manager, Betty Fortney.  The agents chose 10:00 a.m. because they believed it to be the most convenient and least complicated time to conduct the search.  The agents were dressed in business attire and their guns were concealed.  Before the search began and after the search ended, Agent Jeffrey Knutson videotaped the office, trying not to film any of the patients in the waiting room.  Both Geasley and Knutson stated that the office staff was very cooperative during the search.  Betty Fortney also stated that the office was not crowded during the search and that the officers acted in a polite and professional manner.

In order to retrieve the patient files, Geasley provided Betty Fortney with a patient list.  This list purportedly included the names of 125 patients.  A staff member matched the names with the chart numbers, as the charts were not in alphabetical order, and

the agents pulled the charts.  Sixty-eight (68) patient files were taken from 777 Washington Avenue.  An inventory list was left with Fortney, along with a copy of the search warrant and the attachments A and B.  Geasley did not leave a copy of the patient list or the affidavit with Fortney.

Former agent for the Medicare Fraud Control Unit, Diane Lee Lott, testified in regard to the search of Lazar's office located at 791 Estate Place.  According to Lott, she documented the entry and exit of the search, collected evidence, sketched the facility and acted as a "taint" agent.  Lott took patient files during the search as well as three files labeled attorney's files, documents concerning financial information, including e-mails, and three backup tapes that concerned billing.  When asked what authority she had for taking these files, Lott answered that she was under the impression that pursuant to the search warrant, she could take whatever items that may constitute evidence of a crime.  Lott stated that the three attorney's files were sealed and delivered to the United States Attorney's Office.  On the Wednesday following the search, Lott returned to 791 Estate Place to make a sketch of the office and make a mirror-image copy of Lazar's computer hard drive.  As a result of the search at Estate Place, sixty-nine (69) patient files were taken, along with sixty (60) CT scans, three (3) files that were clearly marked attorney's files, a file containing

9

six (6) years of medicare/medicaid claims, and three backup tapes full of billing information.

In this motion, Lazar requests that the court exclude: (1) all patient files, business records, and computer data seized under the warrants; and (2) all evidence, both documentary and testimonial, that the government subsequently discovered or obtained which is derivative of the items obtained during the searches, including all expert testimony.

PROPOSED CONCLUSIONS OF LAW

## I.    PARTICULARITY

The first issue before the court is whether the search warrants pass the "particularity test" of the Fourth Amendment. The Fourth Amendment states unambiguously that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly* describing the place to be searched, and the person or *things to be seized*." U.S. CONST. amend. IV. Warrants which fail to identify with particularity the items to be seized are considered "general" or "exploratory" warrants as they do not circumscribe the discretion of the executing officer, nor do they "assure[] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search. *Groh v. Ramirez*, 540 U.S. 551 (2004)(*quoting United States v. Chadwick*, 433 U.S. 1, 9

10

(1977)).

Lazar contends that the warrants presented to the magistrate judge were defective "general warrants" and the evidence seized from the offices should be suppressed.   Lazar argues that both warrants authorized unlimited searches of all patient records, all business records, and all computer data because they did not describe with particularity the records to be seized.

Lazar contends that by not identifying a single patient by name on the warrant or incorporating by reference a list of patients, the agents exceeded the clear limits of the search warrant.  While it is unclear why there was no reference made to a list of patients or no patient list was incorporated, the undeniable fact remains that the warrants did not specify, nor did they authorize, the seizure of any particular patient record.

The government insists that AUSA Kevin Whitmore and Agent Lee presented a patient list to the magistrate judge for his consideration prior to the signing of the warrants.  However, AUSA Whitmore testified that he did not presently have the original patient list that the magistrate judge received nor is the original in the clerk's file.  The government thus asks the court to rely on a patient list, even though its whereabouts are unknown, that was not referenced in the warrants, attached to the warrants or incorporated into the warrants to save the warrants from the

11

particularity requirement.

The fact that the magistrate judge may have viewed a patient list before signing the warrants does not save the warrants from its facial invalidity. In a recent Supreme Court decision, the Court held that a warrant was lacking in particularity because it provided no description of the type of evidence sought. *Groh v. Ramirez*, 540 U.S. 551 (2004). The facts in this case are similar to the facts in *Groh*. In that case, Groh, an ATF agent, applied for a warrant to search Ramirez's ranch for a large stock of rifles, grenades, and rocket launchers. The agent supported his application for a warrant with a detailed affidavit that set forth the basis for his belief that the items were on the ranch. A magistrate judge signed the warrant after reviewing the application and affidavit. The warrant was not specific in regard to the items to be seized. The description of the items to be seized only indicated where the items could be found and did not incorporate by reference the itemized list contained in the application. Despite the fact that the application adequately described the things to be seized, the Court held that the warrant was facially invalid because the warrant did not incorporate other documents by reference and neither the affidavit nor the application accompanied the warrant.

In the present case, neither of the search warrants or the

12

attachments referenced on the face of the search warrants contain a list of patient names, nor do the affidavits or the applications. In the space set aside for a description of the items to be seized, the warrants merely refer to Attachments A and B.  Attachment A describes the premises to be searched, not the items to be seized. Attachment B describes the items to be seized.  The first category in Attachment B refers to patient records for patients whose names are not included in the warrant or in any list that is attached or referred to in any part of the search warrants or the applications or affidavits.  Unless the particular patient list created by AUSA Whitmore was set forth in the warrant, or at least incorporated by reference, there can be no assurance that the magistrate judge actually found probable cause to search for, and to seize, the patient records listed on the patient list. In effect, the warrant purports to authorize a search of all patient records at Lazar's offices, despite the fact that the government believed that only specific records were evidence of criminal activity as demonstrated by AUSA Whitmore's creation of a patient list.

It can hardly be argued that where the Supreme Court is unwilling to uphold a warrant where the items to be seized are described in an unincorporated application, that this court should allow the government to rely on a patient list which was not incorporated in either the applications or search warrants in order

13

to save the search warrants from the particularity requirement of the Fourth Amendment.  Here, the warrants were obviously deficient and plainly invalid so as to render the searches warrantless and thus unconstitutional.

Lazar further contends in addition that every category in Attachment B violated the Fourth Amendment's particularity requirement because they were left unlimited in scope and duration. It is undisputed that Attachment B contains no limitation as to any relevant dates of items to be seized.  At the time the search warrants were issued, the government had been investigating Lazar for almost two years.  Rather than specify exactly which documents it was seeking, the government chose to use descriptions of items to be seized that referenced no specific patients, no specific transactions, and most importantly, no time frame.  The Sixth Circuit has held that "[f]ailure to limit broad descriptive terms by relevant dates, when such dates are available . . ., will render a warrant overbroad." *United States v. Ford*, 184 F.3d 566 (6th Cir. 1999).  While a time frame was mentioned in the affidavits, the affidavits were not incorporated into the warrants and there was testimony that the affidavits were not presented to the office manager at the time of the search.

14

Accordingly, the court concludes that the categories of items listed lacked the requisite particularity. The words used in Attachment B to describe the items to be seized left room for the agents to seize whatever items they wished without limitation. Thus, it is submitted that the warrants at issue failed to conform to the particularity requirement of the Fourth Amendment and therefore the searches conducted on October 9, 2002, of Lazar's office premises were unconstitutional.

II.   GOOD FAITH EXCEPTION

If the warrants are in fact defective, it is submitted by the government that this case falls under the "good faith" exception of *United States v. Leon*, 468 U.S. 897, 926 (1986). Under *Leon*, when an officer, acting with objective good faith, has obtained a search warrant from a detached and neutral magistrate and has acted within its scope, the results of the search are not excludible even if the affidavit is later found to be insufficient to establish probable cause, unless (1) the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the issuing magistrate failed to act in a neutral and detached fashion and merely served as a rubber stamp for the police; (3) the

15

affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or where the warrant application was supported by nothing more than a bare bones affidavit; or (4) the warrant was facially deficient in that it failed to particularize the place to be searched or the things to be seized. *United States vs. Leon*, 468 U. S. 897, 926 (1986).

Lazar contends that pursuant to *United States v. Leon*, 468 U.S. 897 (1984) and *Groh v. Ramirez*, 540 U.S. 551 (2004), the good faith exception does not apply in this case because the warrants were facially defective "general warrants." Because the government's agents prepared an invalid warrant by not listing patient names in ¶ 1 of Attachment B, the government cannot argue that it agents reasonably relied on the magistrate judge's finding that the warrant contained an adequate description of the things to be seized and was therefore valid. *Id*. The exception cannot be used where a deficiency is not brought to the magistrate judge's attention. *Id*. at 1292 n.4. In *Groh*, the Court stated that "petitioner did not alert the Magistrate to the defect in the warrant that petitioner had drafted, and we therefore cannot know whether the Magistrate was aware of the scope of the search he was authorizing. Nor would it have been reasonable for petitioner to

16

rely on a warrant that was so patently defective, even if the Magistrate was aware of the deficiency." *Id.*

In the present case, neither Agent Lee nor any other agent involved in the search did anything to point out the deficiency, despite the fact that it was obvious. Instead, the agents seized numerous patient-related records where not a single one was particularly authorized. Accordingly, the government's argument that the good-faith exception saves the invalid searches is not well-taken.

III. <u>PROBABLE CAUSE CONNECTING THE LOCATIONS TO BE SEARCHED</u>

Lazar contends that the affidavits of Agent Lee that were presented with the search warrants contain unsupported conclusory statements attempting to connect the places to be searched with the items to be seized. Lazar maintains that there is no substantiated information present in the affidavit that connects the records to be seized in Attachment B to the two locations that were searched and that the agents' mere belief that Lazar controlled the two locations is not enough to satisfy the requirement of probable cause, and therefore the evidence obtained from these searches should be suppressed. Alternatively, Lazar argues that information given to the affiant by Judiath Luke or Dr. Neil Beckford was stale

17

as these individuals had not worked for Lazar for over a year prior
to the searches at issue.    Moreover, Lazar claims that just
because the government had entered his offices and seized records
before under different authority, does not mean that he still
maintained his records at those locations.  Instead, Lazar argues
that with the knowledge that the government could seize records any
time it wanted, he would have had an incentive to move the records
to a different location.

The government did not attempt to refute the arguments made by
Lazar on this point in its response brief, nor did it mention the
lack of probable cause to connect the locations to the items to be
seized during oral argument.    Rather, the government attempts to
persuade the court that probable cause existed to tie the locations
to the items to be seized by describing the qualifications of Agent
Lee, the knowledge of Judiath Lake, Lazar's ex-office manager,
concerning Lazar's alleged billing practices, and Dr. Neil
Beckford's knowledge of Lazar's alleged billing practices.  This
information does nothing, however, to link the records to be seized
to the locations to be searched.

According to the leading case, *Illinois v. Gates*, 462 U.S. 213
(1983), a magistrate judge's task in finding probable cause is

18

"simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238.  The duty of the reviewing court is to determine whether the magistrate judge had a substantial basis for concluding that probable cause existed.  *Id.* at 238-39.  A mere conclusory statement linking the place to be searched with the items to be seized will not suffice. *Id.* at 239.

In the present case, the affidavit of Agent Lee states that Dr. Lazar owns and operates the two locations to be searched. Attachment A provides pictures of the two locations and the pictures indicate that Lazar has offices in these locations.  There are however no dates indicating when these pictures were taken. The only other mention of one of the locations in the affidavit comes from Judiath Luke's statement to Agent Lee that "the fellows worked almost exclusively in OCM's office at 777 Washington Street, Memphis, Tennessee."  There is no language, express or implied, in the affidavit that connects the items to be seized with the locations that were searched.

19

Accordingly, Agent Lee's statements that "there is probable cause to believe that the locations described herein as well as Attachment A, contain evidence, instrumentalities and/or fruits of crimes," is so conclusory and unsupported to the point that the magistrate judge could not have determined that probable cause existed to connect the locations to be searched with the items to be seized. Consequently, it is recommended that all items seized from either location be suppressed.

IV.  INEVITABLE DISCOVERY

The government insists that the inevitable discovery rule applies in this case. Under the inevitable discovery rule, illegally seized evidence may be admitted despite the exclusionary rule when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered. *Nix v. Williams*, 467 U.S. 431 (1984). "The government can satisfy its burden by showing that routine procedures that [it] would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *U.S. v. Ford*, 184 F.3d 566 (6th Cir. 1999).

20

Prior to the issuance of the October 9, 2000 search warrants, the government had served Lazar with pre-indictment DOJ subpoenas that sought information in connection with the government's investigation. Lazar had begun to comply with the government subpoenas prior to the October 10 searches by producing over 20,000 pages of documents. The government maintains that it could have obtained the medical records of patients or other documentation where needed by use of DOJ subpoenas or grand jury subpoenas. According to the government, subpoenas are routine procedures for obtaining such information. The government claims, however, that it received reliable information that if it served DOJ subpoenas seeking patient records that Lazar would attempt to alter the records to conceal his fraudulent billing practices. In response to this information, the government secured search warrants to obtain patient records instead of using subpoenas.

Lazar contends that the government does not have routine procedures for obtaining evidence in the context of a criminal healthcare-fraud investigation. As such, Lazar maintains that the government is barred from arguing that it would have inevitably discovered the patient records via subpoenas.

It is also submitted by Lazar that the court should reject the

21

prosecution's invitation to make a grand jury or DOJ subpoena an "insurance policy" to protect against an illegal search. The Ninth Circuit case of *Center Art Galleries-Hawaii v. United States*, 875 F.2d 747 (9th Cir. 1989) and the Second Circuit case of *United States v. Roberts*, 852 F.2d 671 (2nd Cir. 1988) are directly on point. In both cases, the government argued that it would have inevitably discovered information that was seized pursuant to an invalid search warrant via a subpoena that had been issued either before or after the issuance of the warrant. Quoting the Second Circuit's decision in *Roberts*, the Ninth Circuit held that:

> The mere fact that the government serves a subpoena, however, does not mean that it will obtain the documents it requests. A subpoena can be invalid for a variety of reasons, as when it is unduly burdensome, . . ., when it violates the right against self-incrimination, . . ., or when it calls for privileged documents. Moreover, we can deplore but not ignore the possibility that the recipient of a subpoena may falsely claim to have lost or destroyed the documents called for, or may even deliberately conceal or destroy them after the service of the subpoena. Thus, the government cannot show that its subpoena would have inevitably resulted in the discovery of the suppressed documents.

*Center Art Galleries-Hawaii v. United States*, 875 F.2d 747, 754 (9th Cir. 1989)(citations omitted).

In this case, the court finds the case law of the Second and Ninth Circuits to be persuasive. Thus, it is recommended that the

22

court reject the government's inevitable discovery argument, particularly in light of the fact that the government acknowledged that it had information suggesting that Lazar would alter patient records if faced with a subpoena.

## V.  GOVERNMENT AGENT'S CONDUCT DURING THE SEARCHES

In Lazar's written motion, he alleges that agents' execution of the search warrants was outrageous and conscience shocking. Despite making these assertions in the written pleadings, Lazar decided not to pursue the allegations at the hearing on May 26, 2005. A copy of the video-taped search was provided to defense counsel by the government and a copy was entered into evidence as Court Exhibit 11. The issue now appears to be moot.

### CONCLUSION

In sum, the search warrants fail to conform to the Fourth Amendment's requirements of particularity. That being the case, the search warrants are facially invalid and did not provide the authority for a constitutional search of either of Lazar's offices. It is thus recommended that the evidence seized during these searches be suppressed.

Furthermore, the affidavit presented to the magistrate judge, along with the attachments, do not provide a sufficient basis for

the determination that the items to be seized were present at the locations to be searched.  Thus, the searches were not based on a finding of probable cause.  Consequently, the items seized from the searches must be suppressed.

The court also rejects the government's assertion that either the good-faith exception or the inevitable discovery doctrine applies in this case.

Accordingly, it is recommended that the items seized in the government's searches conducted at 777 Washington Avenue and 791 Estate Place on October 10, 2002, be suppressed.

Respectfully submitted this 13th day of June, 2005.


_Diane K. Vescovo_

DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 342 in case 2:04-CR-20017 was distributed by fax, mail, or direct printing on June 14, 2005 to the parties listed.

---

Kevin P. Whitmore
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Cam Towers Jones
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Peter M. Coughlan
OFFICE OF THE ATTORNEY GENERAL
425 Fifth Ave., N.
Nashville, TN 37243--049

Marc N. Garber
THE GARBER LAW FIRM, P.C.
4994 Lower Roswell Rd., NE
Ste. 14
Marietta, GA 30068

Stephen Farese
FARESE FARESE FARESE, PA
122 Church Street
P.O. Box 98
Ashland, MS 38603

Honorable Bernice Donald
US DISTRICT COURT